PILOT LIFE INS. CO. v. AYERS.

No. 5599.

Circuit Court of Appeals, Fourth Circuit.

Nov. 5, 1947.

Albert S. Kemper, Jr., of Bluefield, W. Va., and C. R. Wharton, of Greensboro, N. C. (Richardson & Kemper, of Bluefield, W. Va., and Smith, Wharton & Jordan, of Greensboro, N. C., on the brief), for appellant.

Jospeh M. Sanders, of Bluefield, W. Va. (W. V. Ross, of Bluefield, W. Va., on the brief), for appellee.

Before PARKER, SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This suit was brought by the beneficiary named in two life insurance policies in the sum of $2,000 each to recover the double indemnity which the insurance company agreed to pay in the event that the insured should sustain bodily injury resulting in death through external, violent and accidental means, the death being the direct result thereof and independent of all other causes. The insured was killed by a fall from the window of a hotel at which he was staying, and the company paid the face of the policy. The company, however, denies liability for double indemnity on the grounds: (1) that the insured did not die from accidental means but by suicide; (2) that even if the fall was accidental, drunkenness on the part of the insured was a contributory cause; and (3) that he made false answers to specific inquiries in his application. Upon the trial in the District Court the jury found for the plaintiff and upon this appeal the company contends that the District Judge should have granted its request for a directed verdict since in its view the evidence conclusively established all of these defenses.

The evidence on which the company relies as tending to establish suicide may be summarized as follows: Ayers was a married man, forty-two years of age, residing at Bluefield, West Virginia. He was employed by the Norfolk & Western Railway Company as superintendent of signals on the Clinch Valley District which had its western terminus at Norton, Virginia. He was temperate in the use of intoxicants when in Bluefield, but on some occasions when at Norton, where his duties took him for the night once a week, he became intoxicated. On September 5, 1945, accompanied by J. K. Kinzel of Bluefield, an assistant trainmaster, he went to Norton in the afternoon and registered at a hotel where the men were assigned adjoining rooms with a connecting bath. After depositing their bags they went to the Railway to attend to their respective duties. About half past five they met again and went to a department store where they looked at certain clothing and Ayers tried on some suits, but did not purchase any of them. They then returned to the hotel, opened the connecting door, and after cleaning up went down to the lobby. For about forty minutes Kinzel read a newspaper while the insured left the hotel, and when he returned Kinzel noticed that he had been drinking. They decided to go for dinner to an outside restaurant three blocks from the hotel where they took a table and ordered dinner. Before it was served the insured became impatient and left the restaurant without stating that he would return. Kinzel waited for him until 10 o'clock and then returned to the hotel. During the interval the insured was seen on the street and in the act of entering the hotel in a highly intoxicated condition.

When Kinzel returned to the hotel, he found the door to Ayers' room closed and prepared for bed. He was then notified by the office that there was a body lying on the sidewalk. He went through the bath room into Ayers' room and found the lights burning, the sash of the window half way up, and looking out of the window, saw a body which proved to be Ayers' on the sidewalk. The bed in the bedroom had not been disturbed but Ay-

ers' coat was found folded on his suit case. The window in the room when lifted to its full height would not remain open but would drop back to a point about 18 inches from the sill. The sill outside the window was eight inches in width and there were heel prints on it, one of them on the outer edge pointing to the street. The heel of the right shoe of the deceased fitted the impression. The sidewalk below the window was 12 feet wide and the body was found nine or ten feet from the wall.

The metal screen from the window in Ayers' room was found on the sidewalk a few feet from the body. The screen indicated that it had been struck with sufficient violence to cause the wiring to bulge. The occupant of the room below heard footsteps in the room above him shortly before the body was found, and then heard a sharp metallic sound as if the screen had been struck and immediately thereafter saw what he believed to be the screen pass his window and then heard a metal sound from the sidewalk. He heard no outcry and did not see the body fall.

The defendant contends that these facts, considered most favorably from the plaintiff's standpoint, are as consistent with the theory of suicide as with the theory of accident, and since it is only a matter of surmise or conjecture as to what was the cause of death, the plaintiff has not borne the burden of proof and her case must fail. Indeed it is said that the evidence preponderately shows suicide since it indicates that the screen was deliberately knocked from the window, that the body did not fall with the screen, and it was difficult to get out of the window since it would not remain in place when lifted, and that the heel marks on the sill and the position of the body on the sidewalk show that the insured stood upon the sill and deliberately leaped into the street. The motive for the suicidal act is said to have been the knowledge of the insured that his intemperate habits were bound to come to the knowledge of the railroad officials and lead to his dis-

charge, and hence in a moment of despair he took his own life.

This recital, however, furnishes only an imperfect account of the testimony presented to the jury. They were also given the following description of the personality of the insured, the environment in which he lived, and the circumstances surrounding his death. He was happily married, his wife was a deputy clerk of the federal court at Bluefield, the couple were in good health and by reason of their earnings were in good financial circumstances. He owned the house in which he lived. He was a regular worker and lost little time from his position. He was not threatened with the loss of his place. He was of a happy and buoyant disposition. He had arranged for a vacation for himself and his wife beginning September 15th, and had recently purchased new articles of clothing. He was in a cheerfull mood when he went to Norton the day of his death, and had arranged for a motor car to carry him and his companion to Castlewood, Virginia, the next day. There was no indication of suicidal intent and no known motive for self-destruction.

A number of witnesses who lived at Bluefield and Norton, and saw him frequently, testified that they had never seen him drunk. He was undoubtedly drunk, however, on the night of his death. It was a warm night. The insured's room had faced the hot afternoon sun. There was no transom over the door of his room. When he entered his room before he fell he left the hall door unlocked with the key dangling from the lock. He took off his coat and folded it up. He was in the habit of sitting in an open window. There was conflict in the evidence as to the existence and the number and direction of the heel prints on the window sill. Some of the testimony tended to show that the prints were discernible on the sill, pointing more to the right than to the street, as would be the case if Ayers sat on the sill with his back to the left side of the window and his feet on the sill. The insured's injuries indicated that

he struck on his head. The place on the sidewalk at which the body was found was not so far from the wall of the building as to require the inference that the insured had jumped rather than fallen from the window. The guest in the room below was reading during the evening. From this aspect of the situation the plaintiff contends that the deceased in his intoxicated state must have forced the screen out in order to sit upon the sill and subsequently while doing so lost his balance and accidently fell to his death without being seen by the man in the room below; and the plaintiff emphasizes the reasonable probability of this explanation in view of the lack of any satisfactory evidence that this happy and contented man had any motive to take his own life.

It is conceded that under the rule prevailing in West Virginia and many other jurisdictions, the burden of proof is on the plaintiff in a suit against an insurance company, based on a clause in a policy entitling the insured to double indemnity in case of accident, to establish a prima facie case of accidental death before recovery can be had. Likewise it is established in West Virginia that when death occurs from unexplained violent and external means, an accident may be presumed; but the presumption is excluded when the cause of death is shown. Beckley National Exchange Bank v. Provident Life & Accident Co., 121 W. Va. 152, 2 S.E.2d 256; Lambert v. Metropolitan Life Insurance Co., 123 W.Va. 547, 17 S.E.2d 628.

In other words, the West Virginia courts reject the course outlined in certain decisions that there is a presumption of law against suicide of sufficient strength to place the burden of proving suicide upon a defendant insurance company which asserts it in a case of this kind. It follows that when evidence tending to explain the cause of death is offered, the presumption against suicide may not be taken as evidence but the case must be decided upon the facts presented and the inferences deducible therefrom, although the jury in appraising the facts may of course take into account the common knowledge that normal persons do not ordinarily kill themselves. New York Life Ins. Co. v. Gamer, 303 U.S. 161, 58 S. Ct. 500, 82 L.Ed. 726, 114 A.L.R. 1218; Jefferson Standard Life Ins. Co. v. Clemmer, 4 Cir., 79 F.2d 724, 103 A.L.R. 171.

Having regard for these established rules, we nevertheless conclude that when the evidence offered in the District Court is reviewed in the light most favorable to the plaintiff, it appears that the District Judge committed no error in refusing to give to the jury binding instructions in the defendant's favor. Obviously the evidence so considered was not completely inconsistent with the theory of accidental death. On the contrary we think that if the jury accepted the testimony on which the plaintiff relies and the inferences fairly deducible therefrom, they could reasonably conclude that the greater weight of the evidence indicated that the insured came to his death by accidental means.

We are strongly urged to consider the opposite conclusion reached in Lambert v. Metropolitan Life Insurance Company, supra, and we agree that this decision is entitled to persuasive weight; but in any case, we must make our decision upon the facts presented to us and may not be bound by the findings of another court however similar the circumstances may be. See New York Life Ins. Co. v. Sparkman, 5 Cir., 101 F.2d 484. But even if this were not so, the facts in the two cases were so dissimilar that a decision in one would not be a precedent for the other. Notably the facts in the Lambert case disclosed a strong and compelling motive for the suicide of the insured whereas in the pending case the evidence fails to disclose any proof of this kind. Much more similar to the case at bar are the facts disclosed in Lennig v. New York Life Ins. Co., 3 Cir., 122 F.2d 871; Franklin Life Ins. Co. v. Heitchew, 5 Cir., 146 F.2d 71.

The Insurance Company, granting for the sake of argument that the insured did not commit suicide but accidentally fell

when he sat upon the sill of the window, makes the additional contention that his voluntary drunkenness contributed to his death and therefore it was not brought about by accidental means independent of all other causes. The point was raised in the District Court by a request for an instruction, refused by the District Judge, which would have told the jury that if the intoxicated condition of the insured contributed to his death, the plaintiff cannot recover. The appellant refers to decisions which hold that if the insured in a policy like that in suit performs provocative or reckless acts which lead directly to his violent death, it cannot be considered accidental and there can be no recovery even though his abnormal conduct was due to a drunken condition. For example, recovery was denied where the insured, who had been drinking heavily, was killed by a householder whose home he forcibly endeavored to enter. Mulaney v. Prudential Ins. Co., 5 Cir., 125 F.2d 900. The court held that his death was not accidental but was the natural and probable consequence of his conduct. See also Beckley National Exchange Bank v. Provident Life & Accident Ins. Co., 121 W.Va. 152, 2 S.E.2d 256. Recovery was also denied in Kinavey v. Prudential Ins. Co., 149 Pa.Super. 568, 27 A. 2d 286, where the insured fell to his death while recklessly performing stunts on a narrow ledge outside the guard rail of a bridge since the court concluded that his death resulted from his foolhardy conduct.

We do not think that the principle of these cases should be extended to cover all accidents to drunken men where it is possible to say that drunkenness contributed to the mishap; and we know of no decision where this rule has been laid down. It has been decided that mere negligence on the part of the insured, although it contributes to an accident, does not bar recovery unless the policy so states. Zurich General Accident & Liability Ins. Co. v. Flickinger, 4 Cir., 33 F.2d 853, 68 A.L.R. 161. The same rule should prevail in regard to drunkenness. A provision barring recovery for injuries resulting from a number of causes, including intoxication, is found in earlier accident policies. See Travelers' Ins. Co. v. Randolph, 6 Cir., 78 F. 754. The present policy excludes from the coverage death resulting "from bodily injuries inflicted intentionally by another person, or sustained by the Insured while participating in aviation or aeronautics, or while engaged in military or naval service in time of war, or as a result of the commission of a felony, or in the event of death from suicide while sane or insane, or in the event of death from the taking of poison or the inhaling of gas, whether voluntary or involuntary, or as a result of residence or travel in time of war outside of the limits of the continental United States and Canada, or directly or indirectly, wholly or partly as the result of war, riot or insurrection or any incident thereto, either on land or water, or directly or indirectly from diseases or from bodily or mental infirmity in any form, or on account of police duty."

The omission of intoxication from this long list of excepted causes is significant and justifies the application of the rule that the terms of the policy having been prepared by the insurer should be construed most strongly against it.

The case in this phase is thus reduced to the inquiry whether the conduct of the insured was so reckless that it cannot be said that his death was accidental. Where an insured conducts himself in such a manner that death is the natural and probable consequence of his behavior, the resulting mishap is not caused by accident; but sitting in an open window, although imprudent, is not infrequently done without injury and an accident resulting therefrom cannot be said to be a natural and probable consequence. Drunkenness at the time of such an incident, although it may increase the risk, does not require a different conclusion; for if this were so, any accident to an intoxicated person if attributable in any degree to his condition would be excluded from the coverage. The same principle governs as in the case of the accidental

death, as from a fall, of an insured afflicted with a physical disease or infirmity, which in some measure contributes to the accident. It is there held that the fall is the immediate and proximate cause of the fatality and the prior disability of the insured is merely a remote cause which, in the absence of a provision of the policy specifically controlling the matter, does not preclude recovery. See Fairclough v. Fidelity & Casualty Co., 54 App.D.C. 286, 297 F. 681; United States Fidelity & Guaranty Co. v. Blum, 9 Cir., 270 F. 946; Continental Casualty Co. v. Rucker, 50 Ga.App. 694, 179 S.E. 269; Bohaker v. Travelers' Insurance Co., 215 Mass. 32, 102 N.E. 342, 46 L.R.A.,N.S., 543; Lawrence v. Accident Insurance Co., 7 Q.B.Div. 216; Winspear v. Accident Insurance Co., 6 Q.B.Div. 42; 29 Am.Jur. § 996.

Reversal of the judgment is finally sought on the ground that the insured made false statements in his applications for the policies which bar recovery since the double indemnity provisions are expressly excepted from the incontestable clauses of the policies. It is conceded that the objection is fatal to recovery, if supported by the evidence. The facts are that a person bearing the same name as the insured, prior to the applications for the policies, consulted physicians for dizziness, headache, stomach complaint, irregularity of the bowels; and hospital records indicate that for years he had been treated for syphilis. The answers of the insured in the application showed that he had not been afflicted with any of these diseases. There was, however, no direct evidence to show that the person treated by the physicians and in the hospital record was one and the same as the insured. On the contrary, his wife gave testimony tending to show that he differed in appearance from the patient described and that he had never suffered from the complaints for which the patient was treated. The issue thus raised was submitted by appropriate instructions to the jury which found for the plaintiff.

The judgment of the District Court is Affirmed.

Otto Kerner, Jr., U. S. Atty., John P. Lulinski, and Maurice C. Handelman, Asst. U. S. Attys., and Dewey G. Hutchinson, Naturalization Examiner, all of Chicago, Ill., for appellant.